IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

IN THE MATTER OF THE SEARCH OF:

**Commercial building located at 3055 S. State Street, Salt Lake City, UT 84115; and**

**Personal Residence located at 8178 S. 2570 E., South Weber, UT 84405**

Case Nos.   2:23-mj-00402 DBP

**AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER
RULE 41 FOR WARRANTS TO SEARCH AND SEIZE**

## I.  INTRODUCTION AND AGENT BACKGROUND

I, Jeffery Nielsen, being duly sworn upon oath, hereby declare as follows:

1. I am a special agent with the Internal Revenue Service, Criminal Investigations (IRS-CI), and have been employed in this capacity since 2016. My responsibilities include the investigation of possible criminal violations of the Internal Revenue Code, covered under Title 26 of the United States Code; the currency reporting requirements, covered under Title 31 of the United States Code; and the money laundering statutes, covered under Title 18 of the United States Code, Sections 1956 and 1957. I have experience in the execution of financial search warrants and experience in analyzing tax returns and books and records.

2. I completed the required special agent training at the Federal Law Enforcement Training Center in Glynco, Georgia in 2017. My training included lessons in financial investigative techniques, accounting, tax, criminal investigative techniques, criminal law, and search warrants.

3. Prior to my employment as a special agent with IRS-CI, I obtained a bachelor's degree in Sociology with a certificate in Criminal Justice in 2008.

1

## II.  JURISDICTION

4. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## III.  PREMISES TO BE SEARCHED

5. I make this affidavit in support of applications for warrants to search the following premises:

   A. **Commercial building located at 3055 S. State Street, Salt Lake City, UT 84115 (hereinafter, "Exotic Kitty"), as more fully described in Attachment A-1; and**

   B. **Personal Residence located at 8178 S. 2570 E., South Weber, UT 84405 (hereinafter, "EDDY Home"), as more fully described in Attachment A-2,**

for evidence, fruits, and instrumentalities of criminal offenses, including but not limited to violations of 26 U.S.C. § 7201 (Tax Evasion), 26 U.S.C. § 7202 (Failure to Collect or Pay Over Tax), and 18 U.S.C. § 5324(a)(3) (Structuring). As set forth below, I have probable cause to believe that such property and items, as described in Attachments B-1 and B-2, are currently located at the premises.

6. I make this affidavit based in part on personal knowledge gathered during my participation in this investigation, and in part, upon information and belief. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. During this investigation, I reviewed numerous documents, records, and other evidence, done surveillance, and spoke to and consulted with other agents and/or representatives from law enforcement and regulatory agencies. The facts presented in this affidavit were obtained from these sources.

2

## IV.  BACKGROUND

**THOMAS EDDY and DYANI STCLAIR**

7.  THOMAS M. EDDY (EDDY) is an individual who resides in South Weber, Utah.

8.  Between 2015 and the present, EDDY has owned and operated multiple businesses. During that time frame, two of the businesses appear to be the main source of income for EDDY.

9.  The first business is a landscaping business called Nature's Rain, which current filings made with the Utah Division of Corporation (UDOC) show is operated from the EDDY Home. UDOC records show EDDY has operated Nature's Rain since at least 1999 when the first filing for the business was made. Nature's Rain has been registered multiple times with UDOC since 1999, both as a DBA and as a corporation.[1] UDOC records for all of the various iterations of Nature's Rain show EDDY has always been listed as a principal for Nature's Rain, and has held the positions of Applicant, Director, President, Vice President, Secretary, Officer, Incorporator, Treasurer, and Registered Agent for Nature's Rain over its existent.[2] EDDY obtained an Employer Identification Number (EIN) for Nature's Rain in 2015 when he filed a Form SS-4, Application for Employer Identification Number (Form SS-4), with the IRS.

10. The other main business EDDY operates is a strip club venue called Exotic Kitty, which is located in Salt Lake City, Utah. According to UDOC records, Exotic Kitty is a DBA for another business, Sole Source Entertainment, Inc. Both Sole Source Entertainment

---

[1] Nature's Rain has been spelled as "Natures Rain" as well. Both variations are seen on various records, including corporation records, bank records, etc.

[2] With the exception of the first DBA application in 1999, EDDY has been the only person listed as a principal of Nature's Rain.

and Exotic Kitty were registered with UDOC on August 1, 2016.[3] EDDY is listed as the Registered Agent and Sole Source Entertainment is the Applicant for Exotic Kitty. EDDY is the sole principal of Sole Source Entertainment, and holds the positions of President, Director, and Registered Agent. The principal business address for Sole Source Entertainment is the Exotic Kitty commercial building address, and the EDDY Home is the registered agent location. EDDY obtained an EIN for Sole Source Entertainment via filing a Form SS-4 with the IRS in 2016.

11. DYANI R. STCLAIR (STCLAIR) is an individual who resides with EDDY in South Weber, Utah. STCLAIR and EDDY have lived together since about 2015, but do not appear to be married.

12. STCLAIR claims in an online posting to have worked at the Exotic Kitty since it was opened. STCLAIR further claims she worked at other local exotic clubs prior to working at the Exotic Kitty. Records from Department of Workforce Services support she worked for another local strip club called Trails Gentlemen's Club in 2015.

13. In addition to her work for Exotic Kitty, STCLAIR has also started a couple of businesses in the last couple of years.

14. The first business is Dyani Divine, LC. UDOC records show Dyani Divine was registered on February 13, 2020. The address for Dyani Divine is the EDDY Home. STCLAIR is the sole principal of Dyani Divine and holds the positions of Member and Registered Agent. According to Dyani Divine's website, the business sells exotic clothing for dancers. STCLAIR obtained and EIN for Dyani Divine via filing a Form SS-4 with the IRS in 2020.

---

[3] Both businesses have an expired status with UDOC at this time.

15. STCLAIR also operates another business called Alessia Inc. Alessia was registered with the UDOC on March 11, 2021. The address listed for Alessia is the EDDY Home. STCLAIR is one of three principals in Alessia, and holds the position of Director. All three principals listed show their contact address as being the EDDY Home. Your affiant has not been able to locate a lot of information regarding Alessia to date. An EIN was obtained for Alessia in 2021.[4]

**EDDY's Tax Filing History**

16. EDDY has some history of filing a Form 1040, U.S. Individual Income Tax Return (Form 1040). According to IRS records, EDDY filed Forms 1040 for tax years 2013, 2014, and 2015.[5] The IRS does not have record of EDDY filing any Forms 1040 for 2017, 2018, 2019, 2020, or 2021.

17. For the 2013, 2014, and 2015 Forms-1040, EDDY filed a Schedule C-EZ, Net Profit From Business (Schedule C), with his returns. The Schedules C which are included with EDDY's Forms 1040 are all used to claim income from Nature's Rain. A Schedule C is a form attached to a Form 1040 and is used by the taxpayer to claim income from a business treated as a Sole Proprietorship. The Schedule C-EZ is a simplified version of the Schedule C, and is used if less than $5,000 of business expenses are claimed against the gross receipts of the business.

---

[4] Your affiant is not sure if STCLAIR obtained this EIN via the Form SS-4 because the applicant did not complete the executor name field, but the address on the Form SS-4 is the EDDY Home.
[5] EDDY may have filed a Form 1040 for tax year 2016, but the IRS has tagged the return as a possible identity theft filing. Based on the information included on the 2016 Form 1040, your affiant believes it could be a legitimately filed return, but is still trying investigating why it was tagged a potentially fraudulent. If the 2016 Form 1040 is legitimate, then 2016 would be the last year EDDY filed a federal income tax return. If the 2016 Form is not legitimate, then 2015 would be the last year EDDY filed a federal income tax return.

18. EDDY did not claim any business expenses for 2013, 2014, or 2015, so his gross receipts are the same as the net profits claimed from Nature's Rain for those years. EDDY claimed the following income from Nature's Rain on his Schedules C: $12,800 for 2013; $10,000 for 2014; and, $3,450 for 2015.

19. EDDY electronically filed his 2013 Form 1040. EDDY claimed a filing status of Head of Household since he claimed two children that year, one of which was a niece. EDDY claimed $21,430 of total income for 2013, which included the $12,800 of income from Nature's Rain discussed above, as well as $8,630 in unemployment compensation. Ultimately, EDDY was able to claim a $4,266 refund partially due to receiving the Earned Income Credit (EIC) that year.

20. EDDY electronically filed his 2014 Form 1040. EDDY claimed Head of Household status and claimed his daughter. EDDY claimed $10,998 in total income for 2014, which includes the $10,000 of income from Nature's Rain and $998 of income from three different employers who provided EDDY with a Form W-2, Wage and Tax Statement (Form W-2).[6] Again, EDDY received a $2,914 refund partially due to claiming the EIC.

21. EDDY electronically filed his 2015 Form 1040. EDDY claimed Head of Household status and claimed his daughter. EDDY's total income for 2015 was $11,067, which included the $3,450 of income from Nature's Rain. The rest of the income was a small amount of unemployment and taxable pensions/annuities, and then $6,703 of Form W-

---

[6] Two of the employers who provided EDDY with a Form W-2 are Gold River LLC and International LLC. Both Forms W-2 totaled less than $400 of income in 2014. Both companies are tied to an individual who your affiant believes is the owner of other local strip clubs. Also, Gold River was the company running a strip club at the same location as the Exotic Kitty just before EDDY registered the Exotic Kitty with UDOC.

2 wages from three different employers.[7] EDDY received a $4,462 refund partially due to claiming the EIC. EDDY included his phone number ending in xxx2004 as a contact number for the IRS.

22. Based on his history of tax filings in 2013, 2014, and 2015, EDDY understood his obligations to file federal income tax returns for himself and for his business income.

**STCLAIR's Tax Filing History**

23. According to IRS records, STCLAIR has not filed many federal income tax returns. The only years the IRS has record of activity is for 2014 and 2019.

24. In 2014, STCLAIR filed for an extension to file a 2014 Form 1040, but ultimately never filed the 2014 Form 1040.

25. In 2019, STCLAIR electronically filed a Form 1040. STCLAIR claimed Single status and has her home address listed as the EDDY Home. STCLAIR only claimed $1 of taxable interest and a total of $1 in total income. STCLAIR claimed no taxes due and owing, and did not receive a refund for 2019. STCLAIR included an email address ending in xxx@yahoo.com as a contact address for the IRS.

26. Following the filing of the 2019 Form 1040, STCLAIR received $3,200 of Economic Impact Payments in 2020 and 2021.

**Business Related Tax History**

27. As discussed above, EDDY and STCLAIR have obtained EINs for their businesses. The reason to obtain an EIN for a business is for tax administration purposes. This includes having an entity identified via an EIN so a Form W-2 can be issued to

---

[7] All three companies are tied to the individual discussed in the footnote above.

employees for wages earned by the employee, or for a business to issue a Form 1099-MISC, Miscellaneous Income (Form 1099), to independent contractors for payments for services provided to the issuing business. The IRS requires the Forms W-2 and Forms 1099 to be filed with the IRS so the IRS is aware of payments made to those employees and contractors.

28. EINs are also important in relation to employment taxes. Employment tax issues include the withholding of taxes by employers on behalf of employees, federal unemployment taxes (FUTA), and social security and Medicare taxes (FICA). Businesses are generally required to file quarterly tax forms to disclose to the IRS the amount of withholdings being held by the business. The business is also required to pay over those funds to the IRS, as well as the amounts withheld for FUTA and FICA taxes. Federal income taxes withholdings and the FICA taxes are reported by businesses via a Form 941. FUTA taxes are reported by businesses via a Form 940.

29. As discussed above, EDDY included income related to Nature's Rain on Schedules C for tax returns he previously filed with the IRS through the 2015 tax year. Since 2015, Nature's Rain has not filed any business income tax returns.[8]

30. According to IRS records, Nature's Rain has never filed any Forms 941 or Forms 940 for employment taxes. There is also no record of Nature's Rain filing any Forms W-2 or Forms 1099 for any employee wages or payments made to independent contractors, including for any wages or payments made to EDDY.

---

[8] The only exception would be if the previously mentioned 2016 Form 1040 in EDDY's name was determined to not actually be fraudulent, as Nature's Rain was again listed on a Schedule C as part of that return.

31. Sole Source Entertainment and Exotic Kitty have never filed any business income tax returns since its creation in or about 2016.[9] Sole Source Entertainment and Exotic Kitty have never filed any Forms 941 or Forms 940 for the employment taxes. There is also no record of Sole Source Entertainment or Exotic Kitty filing any Forms W-2 or Forms 1099 for any employee wages or payments made to independent contractors, including for any wages or payments made to EDDY or STCLAIR.

32. Dyani Divine and Alessia have never filed any business income tax returns to date, nor have they filed any Forms 941 or 940. There is no record of Dyani Divine or Alessia filing any Forms W-2 or Forms 1099 for any employee wages or payments made to independent contractors, including for any wages or payments made to STCLAIR.

**Statutory Authority**

33. As a result of my training and experience, I know that, under the laws of the United States, it is a criminal offense:

A. to willfully attempt in any manner to evade or defeat any tax imposed under Title 26 of the United States Code, pursuant to 26 U.S.C. § 7201;

B. to willfully fail to collect or truthfully account for and pay over any tax when required to do so pursuant to 26 U.S.C. § 7202; and

C. to structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institution for the purpose of evading the reporting requirements of a currency transaction report, pursuant to 31 U.S.C. § 5324(a)(3).

---

[9] Similar to above, Sole Source Entertainment was included on the 2016 Form 1040 in EDDY's name as part of a Schedule C. This was the first and only time Sole Source Entertainment was included on any of EDDY's federal income tax returns.

## V.  FACTS ESTABLISHING PROBABLE CAUSE

34. I am investigating EDDY and STCLAIR for tax evasion and structuring. As demonstrated below, there is probable cause to believe EDDY and STCLAIR have taken evasive acts, in addition to either filing a false tax return or without filing a tax return, in an attempt to defeat the assessment of their taxes. Bank records and other evidence reflect that EDDY and STCLAIR have deposited substantial sums of money, to include several million dollars in cash, into various bank accounts they control, which sums are not accounted for on any tax return or other tax filing.

35. Cases where a subject fails to file a tax return, coupled with affirmative acts of evasion, are known as a Spies evasion. The Supreme Court, in *Spies v U.S., 317 U.S. 492 (1943)*, gave examples of what can constitute an "affirmative willful attempt" to evade in a Spies case: "Keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind and any conduct, the likely effect of which would be to mislead or to conceal."

36. In this matter, the way EDDY has conducted his businesses to rely heavily on cash, structuring cash deposits into bank accounts, commingling of company funds, and commingling personal use of funds in business accounts are affirmative evasive acts EDDY has taken to defeat the assessment of taxes related to the businesses and his personal income taxes.

37. Another byproduct of EDDY's actions includes possible evasion of employment taxes. As noted above, neither Nature's Rain nor Sole Source Entertainment DBA Exotic Kitty have

filed any Forms 941, Forms 940, Forms W-2, or Forms 1099. This includes any filings related to EDDY, STCLAIR, or several individuals your affiant believes may have worked, or currently work, for the businesses over the last few years. Based on the investigation and evidence gathered thus far, it appears that individuals are working for the businesses, but nothing has been filed in relation to employment taxes by either of the businesses. If the businesses are required to do so, EDDY would appear to be the person required to file the necessary employment tax forms as the sole owner and operator of the businesses.

38. STCLAIR also tends to make a lot of cash deposits into her bank accounts. If she is earning income from the Exotic Kitty and EDDY, this would possibly explain her heavy use of cash deposits. In addition to cash deposits, other main sources of funding for STCLAIR's accounts are Venmo and other money transfer services. It is not known at this time what these payments are regarding, but the amount of deposits STCLAIR has made into her accounts since at least 2019 show STCLAIR should be required to file federal income tax returns if those funds are income to her.

**Applications for Financing**

39. During the course of the investigation, I obtained bank records tied to EDDY going back to January 1, 2015. These records also include copies of various loan applications for credit cards, auto loans, etc. The loan applications are helpful in showing the income disclosed by EDDY since about January 8, 2015 (the first loan application obtained), through June 29, 2022 (the most recent loan application obtained).[10]

---

[10] EDDY used the same phone number, ending in xxx2004, for both applications. This is also the same phone number EDDY provided on his 2015 Form 1040.

40. EDDY has made multiple applications for loans during the time frame above. A few, generally for each tax year, are highlighted below to show the income levels disclosed by EDDY over the various tax periods or if something else relevant is in the application.

41. On or about January 8, 2015, EDDY submitted an auto loan application through America First Credit Union (AFCU). The loan appears to be a stated income loan as there was a checked box with "Stated 4000" next to the box on the application. The application states that EDDY worked as a bouncer at a local strip club, with a monthly net income of $1,018.53 from that job. Based on everything in the application, I submit that this application shows EDDY claimed to be making about $4,000 per month, part of which came from a job as a bouncer.

42. On or about August 17, 2015, EDDY applied for a car loan through Cyprus Credit Union (Cyprus CU). In this application, EDDY stated he was employed by Nature's Rain as a Landscape Architect with $7,000 per month income. Included in the records for this application is a single-page printed document dated August 18, 2015, at 11:18 AM. The header of the document states "Nature's Rain Payroll Summary, January 1 through August 18, 2015" (hereinafter, "2015 Payroll Record"). Based on my experience, the 2015 Payroll Record appears to be a record printout produced by QuickBooks, or similar bookkeeping program. EDDY's 2015 Payroll Record shows he earned $52,500 in gross income by August 18, 2015. The 2015 Payroll Record also shows $10,006.50 of taxes withheld, including federal withholdings, FICA, and FUTA taxes, leaving a net pay of $42,493.50. The 2015 Payroll Record further shows employer taxes and contributions of $3,570.58 for the timeframe. There is handwriting with the gross amount circled with a line leading below

with divide sign and "7.58 = $6,926.12". This appears to support the $7,000 per month on the application form.

43.  The 2015 Payroll Record is important for a couple of reasons. It shows EDDY appears to have used bookkeeping or accounting software on an electronic device to track various records related to Nature's Rain going back to at least 2015. The payroll sheet also shows by mid-August 2015, EDDY had grossed $52,500. This contradicts EDDY's 2015 Form 1040 where EDDY only claimed $6,703 in wages and another $3,450 in business income from Nature's Rain. Finally, the 2015 Payroll Record shows federal taxes withheld, but no record of this information or funds were ever provided to the IRS.

44.  In 2017, EDDY made a couple of applications for various loans. One was an auto loan for a new 2017 GMC Yukon through Mountain America Credit Union (MACU), which was dated November 29, 2017. In the application, EDDY claimed $13,315.25 in gross monthly income. Included with the loan documents is another single-page printed document. The document has EDDY's name at the top, and below with other various fields it states, "Employee Pay Stub", shows a pay period of "10/31/2017 – 11/13/2017", and a pay date of "11/15/2017". At the bottom of the page is print showing Nature's Rain, its address in West Jordan, Utah (where EDDY had also lived in the past), a phone number,[11] and Nature's Rain EIN ending in xxx9267 (hereinafter, "2017 Paystub"). The 2017 Paystub shows EDDY's gross pay for that pay period was $10,109.71, and the year to date (YTD) gross pay amount was $212,303.90. The 2017 Paystub again shows taxes withheld, including a federal withholding, FICA, and FUTA. The withholdings for that pay period

---

[11] The phone number at the bottom ends in xxx4597. When doing an online search for the phone number, current results show it is now tied to the Exotic Kitty. The application also shows EDDY's phone number ending in xxx2004 as his personal and business phone number.

were $3,964.21, and the YTD withholdings were $83,248.41. The net pay field showed current net pay of $6,145.21 for that pay period, and a YTD net pay of $129,055.49.

45. The 2017 Paystub is significant for the same reasons as the 2015 Payroll Record: it shows EDDY was still using bookkeeping or accounting software on an electronic device to track business records; it shows he earned an amount of income that would have required EDDY to file for 2017; and, it shows federal taxes withheld, but no record of this information or any payments was ever provided to the IRS.

46. In April 2018, EDDY applied for a boat loan through MACU. In the application, EDDY claimed $20,000 per month in gross salary from Nature's Rain. The work phone number listed was his phone ending in xxx2004, and the home phone listed is the same phone ending in xxx4597 discussed in footnote 11 above.

47. On or about October 20, 2018, EDDY made an offer to purchase the EDDY Home. The sale of the home closed on or about January 31, 2019. Title records show the purchase price for the EDDY Home was $1,460,000 and the loan amount was $1,314,000. In total, EDDY paid $147,346.57 in funds to purchase the home, which included $5,000 in earnest money and a $142,346.57 wire to close.

48. In the final mortgage application dated January 8, 2019, but signed January 31, 2019, EDDY claimed his employment as the owner of Nature's Rain and showed he earned $30,275.96 per month in base income from Nature's Rain.[12] EDDY provided banking information showing he had a balance of $212,092.36 in his MACU account, and showed he owned property in Hermitage, Missouri, valued at $455,000.[13]

---

[12] In the application, EDDY used his phone ending in xxx2004 as his business and personal phone number. Further, according to title documents obtained, an email disclosure was sent to EDDY at his email address ending in xxx@aol.com.
[13] More will be discussed on this property below.

49. As part of obtaining the mortgage, EDDY sent the loan underwriter a printed letter signed by him and dated January 15, 2019. In the letter, EDDY stated he was the "100% owner of my business" and has "been the 100% owner since inception." EDDY attached UDOC records related to Nature's Rain to the letter.

50. Also in the letter, EDDY wrote he does "not use a CPA or Tax Preparer and have handled my business's finances since the beginning." EDDY wrote he was "highly capable of taking on that duty without outside help." In addition to this information, EDDY said he could "certify that my expense factor is 25% as per my Profit and Loss and has been and I forsee that in the future (*sic*)."[14]

51. Even though EDDY claimed to handle his own finances, the lender also had two different letters from a local tax preparer included in the file. In the first letter dated January 17, 2019, the preparer wrote he verified EDDY was the sole owner of Nature's Rain and verified Nature's Rain had an expense factor of 25%. In the second letter dated January 28, 2019, the preparer wrote he reviewed financial reports from EDDY for the previous two years and was able to determine an expense factor of 25%. The preparer restated the research done to verify EDDY was the sole owner of Nature's Rain.[15]

52. These letters from EDDY and the tax preparer are significant. First, it shows EDDY was using an electronic device to create and to send communications with the lender. Second, it shows he either was able to provide a financial statement to an unrelated tax preparer for

---

[14] In this and subsequent letters, the expense factor (also called expense ratio) of Nature's Rain is discussed. Based on my research, the expense factor is something lenders consider when reviewing loan submissions by self-employed borrowers and may need to be on a letter from a tax professional or CPA. The expense factor looks at deposits made into a bank account and gives an estimation of the percentage of income used up by business expenses. The bank can then consider the remaining amount when calculating whether to lend to the borrower.

[15] Per the previous footnote, your affiant believes EDDY may have had the tax preparer review some records to draft the letters as a requirement for the loan even though EDDY may not be a client.

review or lied about doing so. Finally, he made claims of his ability to handle the business finances, and referred to a Profit and Loss statement (P&L). A P&L is an important financial document produced for businesses to know and understand how their business is operating during a current timeframe. If EDDY, as stated, handles the finances and can generate a P&L, it is highly likely EDDY is using some sort of electronic financial software to do so. This information, along with the information noted previously about the 2015 Payroll Record and 2017 Paystub provided as part of a loan, further supports EDDY is likely using financial bookkeeping or accounting software to track the financials of his businesses on a computer or other electronic device.

53. In a MACU credit card loan application made on or about April 25, 2019, EDDY electronically signed the documents using DocuSign. The DocuSign certificate shows the document was emailed to EDDY at his email address ending xxx@aol.com and was signed using a mobile electronic device. Correspondence provided by the bank shows EDDY responded to two emails that same day with the bank employee assisting with the applications who had sent the DocuSign link. EDDY used the same email address ending in xxx@aol.com for both emails, and both emails have a signature line reading "sent from my Verizon, Samsung Galaxy smartphone". This application did not include any disclosures by EDDY as to his income at that time.

54. In July 2019, EDDY applied for a car loan through MACU to purchase a 2019 Cadillac Escalade. In the application, EDDY stated his employer was Exotic Kitty. In a field for trade or occupation, EDDY wrote "owner", and in the salary field "300k". EDDY listed the phone number ending in xxx20004 as his cell phone, and the phone ending in xxx4597

as his business phone. According to loan records I reviewed, this appears to the be the first time EDDY claimed ownership of the Exotic Kitty in financial documentation.

55. In September 2021, EDDY applied for a credit card through AFCU. In the application, EDDY claimed he was employed by Nature's Rain and his work phone number was the number ending in xxx2004. EDDY claimed $40,000 per month in gross income from Nature's Rain. On a line for "Other Income", EDDY put "40K; Exotic Kitty – Owner – 5 Years – Stated". Based on how this application is completed, it appears EDDY was claiming a total of $80,000 per month income at that time. The document was signed electronically by EDDY using DocuSign. According to the DocuSign certificate, the documents for EDDY's review and electronic signature were sent to EDDY's email address ending in xxx@aol.com. EDDY electronically signed the documents on the same day, which was September 28, 2021.

56. In or about April 2022, EDDY applied for a mortgage refinance with the same mortgage company that provided the initial mortgage on the EDDY Home. In the application, EDDY showed his phone number ending in xxx2004 as his work phone, and used his email address ending in xxx@aol.com as his email contact. For his income, EDDY claimed he was the owner of Nature's Rain, which used the same phone number ending in xxx2004. EDDY claimed his monthly income was $24,853.70, and claimed he had $211,058.46 in accounts held at MACU and JPMorgan Chase Bank (JPMC). EDDY also showed he owned a property located in Green River, Wyoming, worth $170,000.[16] To close on the deal, EDDY had to wire an additional $125,689.74 to the title company. These funds were sent from an account in the name of Nature's Rain at JPMC.

---

[16] More about this property will be discussed below.

57. As with the initial mortgage, EDDY provided the loan underwriter with a typed letter and signed by him, which is dated April 18, 2022. This letter is nearly identical to the letter he wrote in 2019. In the letter, EDDY again stated he was the "100% owner" of Nature's Rain and had been since inception. EDDY stated he did not use a CPA or tax preparer, handled the business finances since the beginning, and was "highly capable" of taking on this work without outside assistance. EDDY again certified his expense factor was 25% per his "Profit and Loss".

58. This is important in showing that as of 2022, EDDY claimed he could produce a P&L, which further provides support that EDDY was likely still using QuickBooks or a similar bookkeeping or accounting software to track business income and expenses on a computer.

59. Finally, the most recent application I obtained is an application for the purchase of a new motor home at a price just under $500,000. The application was made through Bank OZK in or about June 2022. In the application, EDDY listed his primary phone number as the phone number ending in xxx2004. EDDY claimed his employer was Nature's Rain and he was earning $37,500 in gross monthly salary. EDDY traded in another motor home as part of the purchase, and paid a down payment of $199,802. The balance of financing was $208,178.13.

**Income and Lifestyle**

60. As described above, EDDY has repeatedly made statements about how much income he earned at various points in time over the last few years. This helps establish that EDDY earned income requiring him to file federal income tax returns, which income would incur a tax due and owing to the federal government.

61. The applications also support what I observed when performing surveillance on EDDY over the last year and a half in that EDDY lives a good lifestyle. His home is worth at least $1.5 million. I have observed him driving multiple vehicles, most of which are newer model year vehicles. These include a Mercedes Benz SUV, a Chevy truck, and a Cadillac Escalade. Based on information from the Utah Division of Motor Vehicles (DMV), EDDY, Nature's Rain, and Sole Source Entertainment have owned many vehicles over the last five years. EDDY also recently purchased a $500,000 motor home. Most of these assets are titled in EDDY's name.

62. In addition to these assets, EDDY has purchased two neighboring pieces of property in Hermitage, Missouri, and has also acquired two new businesses since at least 2018.

63. In or about August 2018, EDDY purchased the first property in Hermitage, Missouri. EDDY offered $60,000 in a cash purchase of the property. At closing, EDDY purchased the property by wiring $59,333.62 from an account in the name of Nature's Rain held at Zions Bank to the title company.[17]

64. In or about December 2019, EDDY purchased a neighboring property to the Hermitage property listed above. EDDY offered the seller $55,000 for this second property, which included $1,000 of earnest money. This purchase is interesting in that the EDDY made the offer to purchase, but the earnest money check was drafted on a personal account in the name of an individual your affiant believes may be EDDY's mother.[18]

65. In addition to the earnest money check, EDDY's possible mother, through a liquor store she operates, provided the title company with a $54,380.39 bank money order, dated

---

[17] This is the same property that was listed as an asset in EDDY's initial mortgage application as being worth $455,000 as described in Paragraph 48.

[18] EDDY used to live with this same individual in or about 2015. This same individual and her current husband also live in or near Hermitage, Missouri, and own a liquor store in that area.

December 24, 2019, to close on the second Missouri property. The day before, on December 23, 2019, EDDY wired $56,000 from his personal MACU bank account to the liquor store's bank account. This appears to be a transfer of money to EDDY's possible mother to cover the funds used in the purchase of the second Missouri property.

66. It is unknown why EDDY specifically purchased the second property in this manner. It is as if EDDY was attempting to use a nominee to make the purchase with funds so as not to appear as if EDDY was the buyer, but both the Missouri properties are titled in EDDY's personal name.

67. In addition to these additional property purchases, EDDY purchased a business and a building in Green River, Wyoming, in or about August 2020. The business is named Budy Inc. DBA Mast Lounge. The Mast Lounge previously operated as a strip club under prior ownership, but has since lost its zoning exemption to operate as such according to the City of Green River. According to county records, EDDY purchased the property where the business was located, and the mortgage appears to be a seller financed transaction with the former owner.

68. I have observed many payments sent from EDDY to the seller in the bank records, and I have watched city hearings on YouTube where EDDY challenged the City of Green River on its zoning decision. Also, I surveilled two male workers drive, in a truck registered to Nature's rain, from the EDDY Home to The Mast Lounge and do what appears to be construction work on the building. The Mast Lounge did not appear to be operational at that time, but it appears EDDY was preparing to re-open it as a bar.

69. Finally, EDDY appears to also be in the process of opening another business in Ogden, Utah, at the location of a former bar and club known as Teazers. Bank records show EDDY

has been making regular payments to the property owner, which may be rent payments for the building. Also, EDDY purchased a stretch limo SUV and registered the vehicle to the business address. Furthermore, your affiant has observed EDDY driving the stretch limo SUV from his home on one occasion, and on another occasion surveilled EDDY drive from the EDDY Home to the Ogden business location. The building does not appear to be operational, but it appears EDDY may intend on opening a business at this location as well.

**Bank Records**

70. EDDY and Nature's Rain have held accounts at multiple financial institutions since 2015, but accounts at three financial institutions appear to have most of the activity between 2015 to present. They are accounts at Zions Bank, JPMC, and MACU. To date, the only accounts I have found tied to STCLAIR are held at MACU and were opened in 2018.

71. I have been unable to locate a bank account in the names of either Sole Source Entertainment or the Exotic Kitty. Based on the records obtained and reviewed to date, I believe EDDY uses either his personal bank accounts or Nature's Rain bank accounts to deposit business income earned by Sole Source Entertainment DBA Exotic Kitty.

72. To better explain findings in the bank records obtained in the investigation, I created several attachments to show a breakdown of account deposits per year at each financial institution mentioned above. Attachments C, D, and E are analyses of accounts in the names of EDDY and Nature's Rain at Zions Bank, JPMC, and MACU, respectively. Attachment F is a combination of all accounts in the names of EDDY and Nature's Rain to see the overall amounts for each year. Attachment G is an analysis of the accounts in the names of STCLAIR and Dyani Divine at MACU.[19]

---

[19] These attachments were prepared based on my review of records of bank spreads prepared by a support staff member. Based on my review of the records prepared by the staff member, and my own investigation

73. Attachment F gives a good overview of the investigation to date. Between 2015 and 2017, the accounts show EDDY's deposited funds fluctuated and he earned somewhere between about $5,600 per month to about $13,600 per month on average. Starting in 2018, EDDY's deposits increased greatly to about $48,000 per month on average and have increased each subsequent year. Your affiant only has records through September 2021, so the amount is averaged over the course of those nine months for 2021. EDDY was averaging about $79,000 per month in 2021 and was on pace to have his highest year of deposited funds.

74. When comparing information from Attachment F to what EDDY disclosed in the loan applications discussed above, there are some remarkable similarities.

75. For example, in the loan application made in August 2015 for a car loan, EDDY provided the 2015 Payroll Record. As of August 2015, EDDY claimed he made a salary of $52,500. That amount is close to the $67,816 of deposits EDDY made into accounts he controlled that year.

76. Another example is the application EDDY made to obtain the initial mortgage on the EDDY Home. In the January 2019 application, EDDY claimed income of about $30,000 per month. According to Attachment F, EDDY averaged about $48,000 in deposits per month in 2019. When accounting for EDDY's claimed 25% expense factor, these numbers are very close. EDDY claimed 25% of his deposits were used to cover expenses; this would leave 75% of deposits available for income purposes. 75% of $48,000 per month is about $36,288 per month, showing his stated monthly income of $30,000 on the application was on par with his deposits in 2019.

---

in this case, I believe the records prepared by the staff member are reliable. There is a possibility there may be some inadvertent inputting errors which could affect the specific numbers presented in this affidavit and the attachments, but based on what I have reviewed to date, I feel confident that these numbers reflect the activity in the accounts.

77. In the July 2019 application for the Cadillac Escalade, EDDY claimed a salary of $300,000. This application was about half-way through 2019. EDDY deposited about $676,000 for the year, so half of the amount is pretty close to the salary EDDY claimed.

78. Finally, in a credit card application in September 2021, EDDY claimed he made $40,000 per month from Nature's Rain and $40,000 per month from Exotic Kitty for a total of $80,000 per month. According to Attachment F, EDDY averaged $79,000 per month in deposited funds for 2021.

79. The only anomaly in the comparisons between the deposits made and the loan applications is in 2017. In the November 2017 application for a GMC Yukon, EDDY provided the financial institution with the 2017 paystub. The YTD pay showed EDDY had earned nearly $212,000. Records obtained to date show just over $100,000 in deposits that year.

80. Except for the November 2017 loan application, EDDY's income claims in the various loan applications are close to what is shown in Attachment F. This further supports that EDDY had knowledge of his income.

81. Attachment F also shows the amount of cash deposited into EDDY's accounts. In 2015 and 2016, the percentage of cash deposits to overall deposits is fairly low compared to 2017 and later years. In 2017, at least 50% of the deposited funds are from cash. This is extremely high, especially when the amount of cash deposited from 2018 through 2021 was about $500,000 per year. In the earlier years, before EDDY owned the Exotic Kitty, most of his income was from non-cash deposits, which is expected from a landscaping business where clients do not regularly pay in cash. After EDDY created Sole Source Entertainment and the Exotic Kitty at the end of 2016, EDDY's cash deposits increased significantly. Strip club patrons generally pay for services and drinks with mainly cash payments. Further

23

discussion on cash usage at the Exotic Kitty based on law enforcement investigation is discussed in more detail later in this affidavit.

82. This information on cash deposits also supports a reasonable inference that EDDY is commingling income from Nature's Rain and Sole Source Entertainment DBA Exotic Kitty. I have not found one account at a financial institution in the name of either Sole Source Entertainment or Exotic Kitty to deposit income from the strip club business specifically. Also, there are payments from the Nature's Rain accounts which appear to be specifically tied to the Exotic Kitty. These include payments to South Salt Lake City, where the Exotic Kitty is located, as well as what appear to be rent payments to the owner of the Exotic Kitty location.

83. The last thing of note about Attachment F is the cash withdrawals. The amount of cash withdrawals from the accounts are very low compared to the deposited cash. This provides support for the cash deposits being income from other sources, as EDDY is not withdrawing enough cash to explain the vast amount of cash deposited yearly. The total amount of cash withdrawals for all years analyzed in Attachment F is lower than the cash deposits in 2017 alone. As such, the substantial sums of cash deposits made by EDDY cannot be explained by withdrawing cash and redepositing the same cash.

**Cash Structuring**

84. In addition to the deposit analysis discussed, bank records also support that EDDY is engaged in structuring. Structuring is the act of making cash deposits in amounts less than $10,000 to avoid having the financial institution file a Currency Transaction Report (CTR) when over $10,000 of cash is deposited into an account in a 24-hour period as required by Title 31 of the U.S. Code. In the EDDY and Nature's Rain accounts, there appears to be

structuring type activity with the cash deposits, and more specifically, through ATM deposit transactions.

85. When EDDY, or possibly others including STCLAIR, make cash deposits into EDDY's accounts, most of the cash deposits are done through an ATM deposit. This is especially true in the more recent years. Deposits into accounts are made about three times a week on average. Also, many of the cash deposits are made with multiple ATM deposit transactions on the same day instead of depositing all cash in one transaction. The bank records reflect that these activities were fairly routine with regard to the cash deposits into the accounts, and seem to occur more often as time progressed. The over $10,000 threshold is not surpassed all the time when these deposit activities occurred, but the abnormal deposit behavior occurs often.

86. A few examples of structuring activity are shown in one of the Nature's Rain accounts held at JPMC, and which were included in the latest records received to date.

87. One example is deposit activity in early June 2021. On June 4, 2021, a $6,679 deposit was made into the account, likely inside of a branch. Then on June 7, 2021, a total of $17,366 was deposited over the course of 11 transactions. The transactions consisted of one cash deposit, likely inside of a branch, and 10 additional ATM deposits. The non-ATM deposit was for $8,878. Most of the ATM deposits were around $600 and $1,400 apiece. Then on June 10, 2021, three more ATM cash deposits were made for a total of $6,255.

88. Another example of the structuring activity was observed in early July 2021. On July 2, 2021, a total of $7,155 was deposited over the course of nine ATM transactions, between $1 and $2,350 per transaction. Then on July 6, 2021, a single $4,736 ATM deposit transaction occurred. Finally, on July 8, 2021, another $5,469 was deposited over four

ATM deposit transactions. This was a total of $17,360 made over 14 separate transactions in six days. It is possible not all these amounts were withheld for separate transactions on separate days, but the excess of deposit activity tends to suggest otherwise.

89. The last example is later in July 2021. On July 22, 2021, a total of $9,075 of cash was deposited over the course of 10 ATM deposit transactions, with most of the transactions being around $600 each. The very next day, July 23, 2021, another $10,056 of cash was deposited over another eight ATM deposit transactions.

90. These examples, with the number of deposits and breaking up of amounts, support that EDDY is likely making the deposits in an attempt to avoid the filing of CTRs. This is not only because the deposits are in smaller amount transactions on the same or successive days, but by also making the deposits at the ATM to avoid dealing with a branch teller.

91. According to CTR data your affiant has obtained to date, EDDY and Nature's Rain have had a total of 41 CTRs filed by financial institutions accounting for $575,437 of cash deposits since the beginning of 2018. The CTRs have captured the transactions where the transactions did cross the over $10,000 threshold, including two of the three transactions highlighted above. When spot checking a couple of the CTR filings with bank records, your affiant noted the CTRs captured transactions where multiple deposits were made on the same day, as has been shown above.

92. For example, the first CTR filed in 2018 was filed by Zions Bank regarding $16,230 in deposits made on April 23, 2018. On that day, the $16,230 was deposited over the course of six deposits ranging from $1,000 to $6,615.

93. Another example was a CTR filed by Zions Bank for cash deposits totaling $11,047 made on December 31, 2018. On that day, the $11,047 was deposited over the course of 10 different deposits ranging from $508 to $2,660.

94. While some transactions may have been captured by CTRs because a single deposit crossed the over $10,000 threshold, there are many abnormal transactions with traits as described above, with multiple deposits in the same day and many at ATMs. This activity seems to occur frequently and appears to be an attempt to avoid a CTR being filed by the financial institutions.

95. The last thing to note about EDDY's cash depositing activity is the location of depositing activities. With the three JPMC examples discussed above, all the deposits discussed, except for the deposits on June 22, 2021, occurred at the JPMC branch closest to the EDDY Home. The deposits on June 22, 2021, occurred at the JPMC branch located nearest to the Exotic Kitty. This was normal activity in that a lot of the deposits were made at financial institution branches near the EDDY Home in lieu of the Exotic Kitty. Based on the deposit activity, there is a reasonable inference that EDDY takes cash earnings from the Exotic Kitty home with him, and then deposits the cash the next day near the EDDY Home. Otherwise, EDDY could easily deposit the funds at a branch just down the street from the Exotic Kitty as occurred on June 22, 2021.

96. As for STCLAIR, Attachment G shows a couple of relevant items. First, the deposit of funds into STCLAIR's personal account and an account for Dyani Divine (which was opened in 2020) shows increasing deposited amounts each year since 2018. Based on the amounts deposited, it appears STCLAIR should also be filing personal and business federal income tax returns. Also, the amount deposited in 2019 was $43,601.94. When compared

to her 2019 Form 1040 filed with $1 of interest income, it appears STCLAIR filed a false tax return by not claiming all income earned in the year.

97. Lastly, the amount of deposited cash seems unsupported based on her business activity. Dyani Divine is an online business retailer of clothing for exotic dancers. As such, it would not make sense for Dyani Divine to have income in the form of cash. It is a reasonable inference that the cash deposited into her accounts is very likely cash earned from the Exotic Kitty, especially since STCLAIR has claimed to work for the Exotic Kitty.

**Cash Activities and Other Evasive Acts**

98. As described in this affidavit, EDDY and STCLAIR are very cash intensive in their transactions with financial institutions. The cash intensive activities would seem to be supported by the cash earned by the Exotic Kitty.

99. On July 29, 2022, three IRS-CI Special Agents went to the Exotic Kitty to observe activities at the club. During the visit, the agents noted the heavy use of cash throughout the night.

100. Upon entering the Exotic Kitty, security staff were outside the main entrance collecting a cash-only cover charge of $10 per patron. After entering the club, the agents noted there was an ATM inside of the club. One of the agents went to buy juice drinks for the group, and asked to pay with a credit card. The bar tender told the agent they did not accept card payments, and pointed the agent to the ATM to withdraw cash. The agent withdrew cash from the ATM, which issued cash in denominations of $20. The agent paid for a juice drink with the cash obtained from the ATM and received cash back in $1 bills.

101. The agents observed that, once a dancer was done performing on stage, the dancer was escorted from the stage and a security staff member would collect the cash provided to the

dancer on the stage. The agents could not see what the security staff did with the cash collected from the dancer.

102. One of the agents purchased a VIP dance, which was $35 per song or $100 for three songs. The agent attempted to pay the dancer, but the agent was told to give the cash to the bartender. One of the agents noticed the bartender appeared to make some notes on paper when the dance was paid.

103. Based on the club visit by the agents, it confirmed that the Exotic Kitty is a cash intensive business. The agents noted they could not see a point of sale for card transactions inside of the business, and were pushed to the ATM when offering to pay with a card. The agents noted there was a decent sized crowd inside of the club throughout the visit, which lasted approximately one hour. The design of the business was geared toward doing as much business in cash as possible based on the observations of the club that night.

104. In addition to supporting what is observed in the bank records in terms of cash deposits, the cash intensive activities also support the lack of Forms W-2 and Forms 1099 being filed for those working at the Exotic Kitty. After having reviewed many of the bank records, there are a limited number of payments which reference labor or payments to known workers of the Exotic Kitty. It appears that most of the payments in the accounts referencing labor are for landscape related workers.

105. Based on the is lack of regular payments made to workers for either Nature's Rain or the Exotic Kitty from any of the bank accounts controlled by EDDY, there is a reasonable inference that EDDY has been paying many of the workers in cash. By paying the workers in cash, it allows EDDY to obfuscate the amount of pay to the workers especially when combined with the lack of Forms W-2 or Forms 1099 issued. These acts help defeat the

assessment of taxes owed. These acts allow workers to make income without the government being aware of the wages paid, thereby creating an opportunity to not claim those wages for tax purposes.[20] It also allows EDDY's businesses to avoid having records filed with the IRS that would show the tax withholdings amounts, amounts to be paid to the IRS, and a record of wage expenses paid by the businesses.

106. As described in this affidavit, it appears EDDY is using his personal bank accounts and the Nature's Rain accounts to run the business-related activities for Sole Source Entertainment and the Exotic Kitty. This could also apply to the two additional businesses EDDY is trying to start in Green River, Wyoming, and Ogden, Utah. Commingling of funds is a common act in tax evasion. By commingling the income of multiple businesses under the accounts of another business, it becomes difficult to unwind which transactions are tied to which business. This is a tactic that is used to further defeat the assessment of taxes and determining each business' income and expenses.

107. In this case, I have had some difficulty trying to determine how active the Nature's Rain landscaping business has been over the last couple of years. I have not observed EDDY performing any landscaping duties to date and, since 2020, the number of transactions which appear to be directly related to landscaping activities are low. Nature's Rain has a Facebook page, but the page has not been updated since about 2019 to show work completed. Since 2019 though, there have been deposits into the accounts referencing landscape activities. Also, I observed on multiple occasions landscaping related equipment such as bobcats and excavators parked on trailers in front of the EDDY Home. Regardless,

---

[20] I have spot checked the tax filing history of people who are known to work for Nature's Rain or the Exotic Kitty. None of the individuals claimed any income from either of those businesses on the tax returns I reviewed.

the commingling of funds further assists in concealing the sources of income and thereby defeating the determination of business activity and proper assessment of income and expenses for each business.

108. As the bank records also show and with some of the examples discussed in this affidavit (*e.g.*, the purchase of the Missouri property with funds from a Nature's Rain account), EDDY also appears to be commingling his personal funds in the business accounts and possibly vice versa. After the purchase of the EDDY Home, some of the initial house payments of about $9,000 per month were made from a Nature's Rain account. Also, a Nature's Rain account has been used to make payments on several of the vehicle loans which EDDY obtained. The use of business accounts and funds to pay for personal expenses is another evasive act and further allows EDDY to defeat the proper assessment of his taxable earnings for personal income tax purposes.

109. Another act of evasion in tax matters is the handling of one's affairs to avoid the creation of usual records required for those transactions. This is where the structuring activity is an issue. The unusual depositing activities show EDDY conducts cash deposits at the banks in an unusual manner. It is abnormal to make multiple deposits at an ATM on the same day especially when the amounts of overall deposits would lead to the creation of a CTR. Some of the examples above did cross the filing threshold amount.

110. Finally, another act of evasion is the use of nominees in transactions. One act where EDDY appears to have used a nominee was the purchase of the second Missouri property described above when EDDY's suspected mother, through her liquor store business and personal account, made the payments to purchase the property. While EDDY has not used other individuals extensively to conduct transactions, EDDY has used the Nature's Rain

bank accounts to conduct business for Sole Source Entertainment and Exotic Kitty, and arguably for the Mast Lounge and the other Ogden business.

## VI. TRAINING AND EXPERIENCE REGARDING ITEMS TO BE SEIZED

111. Based on my experience and training, I know that individuals using electronic mail use computers and other electronic devices to access, draft, send, and receive electronic mail.

112. I also know that individuals preparing financial documents, particularly those that are typed and appear to be computer generated, frequently use computers and other electronic devices, as well as software on those devices, to prepare, edit, and save the financial documents. In this case, my investigation has uncovered documents which appear to have been created using software on a computer.

113. I also know that, based on my review of hundreds of pages of bank records and other documents, EDDY and/or STCLAIR used a computer and/or other electronic devices to engage in the criminal conduct described in this affidavit.

114. I know that:

    A. Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of a crimes; and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the search and seizure of computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of a crime; or (2) storage devices for information about a crime.

B.  Based upon the facts set forth in this affidavit, EDDY's and STCLAIR's hardware, software, related documentation, passwords, data security devices (as described below), and data, are integral tools of the crime and constitute the means of committing it. As such, they are instrumentalities and evidence of the alleged violations. Rule 41 of the Federal Rules of Criminal Procedure authorizes the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them.

1)  Hardware: Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing devices (such as central processing units); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, video display monitors, and related communications devices (such as cables and connections)), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

2)  Software: Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications (like tax preparation, word processing, or spreadsheet programs), and utilities.

3) Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

4) Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.

115. During this investigation and prior investigations, I consulted with other Special Agents in the office, including a Special Agent that is a Computer Investigative Specialist ("CIS") within the Criminal Investigation Division of the IRS.

116. CIS personnel receive extensive training and experience in the area of Seized Computers and Evidence Recovery (SCER). That training includes the planning, preparation, and execution of search warrants involving computers and related equipment, electronic data preservation, and the recovery, documentation, and authentication of computer evidence.

117. I learned from a CIS that information can be stored in an electronic form on a computer hard drive or other electronic storage device. Other electronic data storage devices can be defined as any device or media that can store information in an electronic format and can include the following items: computer hard drives, removable digital media (e.g., external drives, CD/DVD disks, flash memory cards and USB thumb-drives, Cloud storage sites accessible online, external storage disks, computer tapes, etc.), smart phones (e.g., iPhones, Android phones, Blackberries, etc.), tablets (e.g., iPads and Android tablets), scanners,

photocopiers, fax machines, digital camera storage cards, and computerized gaming systems (e.g., Xbox, Playstation, Wii, etc.).

## VII. ADDITIONAL NEXUS BETWEEN PREMISES AND ITEMS TO BE SEIZED

### Exotic Kitty Location

118. Based on the investigation and review of documents, there is probable cause to believe business records are located at the Exotic Kitty. As discussed above, an agent paid for a VIP dance and it appeared as if the bar tender made notes on paper to reflect this payment. Also, the security staff gathered up the cash given to the dancers while the dancers exited the stage area. There is a reasonable inference that the staff are keeping ledgers of which dancers earn money for private dances and while on stage to know how much each dancer earned.

119. Furthermore, I received documents from the Utah State Tax Commission (USTC) related to Sole Source Entertainment DBA Exotic Kitty. From about the 3rd quarter of 2016 through the 2nd quarter of 2019, Sole Source Entertainment and Exotic Kitty filed quarterly sales and use tax returns with the USTC. The address listed for Sole Source Entertainment was the Exotic Kitty location at 3055 S. State Street, Salt Lake City, UT 84115. The last few quarterly returns regularly reported total sales of good and services of about $30,000 per quarter. To report those figures, EDDY and Exotic Kitty had to be tracking records related to sales. This would likely include some type of record keeping being done at the business location.

120. As part of the investigation, I also conducted a mail cover for the Exotic Kitty location. There was not a lot of mail sent to the Exotic Kitty over the course of the month monitored (April 21 to May 20, 2021), but a few records from the State of Utah were sent to the

business location. This includes mail from the Utah Department of Workforce Services and a mailing from a waste disposal company.

**The EDDY Home**

121. Your affiant also conducted a mail cover on the EDDY Home at the same time as the Exotic Kitty. Over the course of the month period, several important mailings were sent to the EDDY Home.

122. Mail was sent to the EDDY Home for the following individuals and entities: EDDY, STCLAIR, Sole Source Entertainment, Exotic Kitty, Alessia, Nature's Rain, and Budy (Mast Lounge). The mailings included items such as utility bills in the name of EDDY, Sole Source Entertainment, and Exotic Kitty. They also included mailings from three financial institutions where EDDY and Nature's Rain hold accounts, two credit card companies, and car financing companies which hold liens on EDDY's vehicles. Your affiant noted mailings from Comcast/Xfinity for both EDDY and Exotic Kitty, an IRS mailing to STCLAIR, a couple of mailings from the City of South Salt Lake for Sole Source Entertainment, a mailing from the City of Green River for Budy, and a Salt Lake County Assessor mailing for Exotic Kitty.

123. With significantly more mailings sent to the EDDY Home for not only EDDY and STCLAIR, but for many of the businesses mentioned in this affidavit, there is a strong likelihood many relevant financial documents which would be helpful to understand the finances for all parties will be located at the home.

124. In addition to the mailings, there are various records for businesses owned by EDDY and STCLAIR which show the EDDY Home as a contact address. Various IRS records related to Sole Source Entertainment show both the Exotic Kitty address and the EDDY Home as

a contact address. Bank records in the names of EDDY, STCLAIR, Dyani Divine, and Nature's Rain show the EDDY Home as the contact address. Also, two trucks registered with the Utah DMV in the name of Nature's Rain show the EDDY Home as the address of record. Finally, nearly all the UDOC filings for all the relevant Utah businesses discussed in this affidavit show EDDY Home to be the principal place of business, the registered agent contact address, or both.[21]

125. Recently, your affiant received utility billing records from the City of South Salt Lake regarding the utility billing for the Exotic Kitty. According to the records, including copies of the three most recent billing statements, the billing statements are sent to the EDDY home and the statements show the EDDY home as the billing address.

126. As discussed in this affidavit, there is a reasonable inference that EDDY takes cash proceeds from the Exotic Kitty to the EDDY Home before depositing the cash at financial institution branches near the EDDY Home. As such, there is probable cause to believe there is cash located at the home and there may be a safe to store and protect any cash holdings.

127. Finally, during various surveillances, your affiant has seen parked vehicles belonging to suspected workers for EDDY's businesses at the EDDY Home on many occasions, as if the EDDY Home is a meeting location for the workers to gather before working. This includes the instance described previously where two males drove a truck registered to Nature's Rain from the EDDY Home to the Mast Lounge. One of those males has been observed driving a vehicle that has been parked many times at the EDDY Home.

**Electronic Devices**

---

[21] The only exception is the DBA filing for Exotic Kitty. The UDOC records show the registration for Exotic Kitty to be expired, and the registered agent address is the address where EDDY lived before purchasing the EDDY Home. Regardless, the address for Sole Source Entertainment does show the EDDY Home as the registered agent location.

128. Based on training and experience, I know that computers and other electronic devices capable of accessing, drafting, and sending emails are common in households in the United States. I also know that most households have multiple electronic devices from which they can access and use electronic mail.

129. I know that many businesses and owners of those businesses regularly keep electronic records related to their business activities on computers, such as the use of electronic bookkeeping and accounting software. Sometimes, those records are not kept on just one computer or electronic device, but sometimes multiple electronic devices are used to create, maintain, and review those records.

130. Over the course of the investigation to date, and as described above, there have been multiple instances of electronic device usage by EDDY and STCLAIR.

131. EDDY produced and provided the 2015 Payroll Record and the 2017 Paystub to financial institutions to obtain loans. EDDY also had email communications with financial institutions and with the mortgage company of the EDDY Home. EDDY electronically signed many documents, including real estate purchase contracts and loan applications, via DocuSign and a similar program called Dotloop. In instances where DocuSign has been used, your affiant has been able to obtain the DocuSign certificates showing EDDY used his email address ending in xxx@aol.com as the email account with which he reviewed and signed those documents. Some of his email communications with the bank have even shown a signature line showing EDDY was responding with his Verizon cellular phone.

132. As for STCLAIR, bank records show she uses what appears to be a personal email address ending in xxx@yahoo.com, and an email account for Dyani Divine ending in xxx@gmail.com. MACU records further show MACU has corresponded with both email

addresses as late as 2020, including emails where STCLAIR sent some business-related records to MACU via the xxx@gmail.com email address.

## VIII. NECESSITY FOR OFF-SITE EXAMINATION OF COMPUTERS

133. I have learned the following from a CIS: To properly retrieve and analyze electronically stored data, to document and authenticate such data, and to prevent the loss of data either from accidental or deliberate programmed destruction, preliminary on-site analysis (and subsequent detailed off-site laboratory analysis) is required by a qualified computer specialist. Affecting an accurate and complete analysis sometimes requires the seizure of all computer equipment, or other electronic storage device, and peripherals which may be interdependent. The seizure of the software to operate the aforementioned equipment, devices, and peripherals, and the related instruction manuals may also be necessary. The need to seize all of the interdependent computer equipment, or other electronic data storage devices, is based upon the following:

A. The Volume of Evidence: Computer storage devices, such as flash drives, disk drives, magnetic tapes, and other large capacity removable media can store the equivalent of thoughts of pages of information. As an example, a 16 GB thumb drive (one gigabyte equals 1,000 megabytes) would have the capacity for storing approximately 1,036,000 pages of Microsoft (MS) Word pages. The majority of desktop computers currently sold generally have a minimum 500 GB (500,000 megabytes) or larger disk drives. To put this in context, a 500 GB drive has the potential to store approximately 32 million pages of MS Word typewritten text (average 8 pages per document), or 50 million email messages (average 1.4 pages per email).

B.  Technical Requirements: When a user wants to conceal criminal evidence, they can store it in random order with deceptive file names. This requires that the agents conducting the search examine all the stored data to determine which particular files are relevant and fall within the scope of the warrant. This search process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on-site. With respect to this latter part of the search, the analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but are not limited to, surveying the various file directories and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files in order to locate the evidence and  instrumentalities authorized for seizure by the warrant); "opening" the file or reading the first few "pages" of such files in order to determine their precise contents; scanning storage areas to discover and possibly recover recently deleted data; scanning ostensibly unused storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to facilitate the recovery of even hidden, erase, compressed, password protected, or

encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Some programs create temporary "print files" for the generation of hard-copy printouts. The software program then automatically deletes those print files (after a predetermined time set by the computer user), with the remaining data being then compressed into a format that is not viewable with standard utility software programs.

C. Unique Computer Hardware or Software: Some computer systems are built using unique or customized computer hardware and/or software wherein the data on those systems are viewable only on the computer hardware and software that created and stored them. Imaged or copied data from those system would result in unintelligible data.

134. In light of these concerns, I request the Court's permission to seize the computer hardware, or other electronic data storage device(s), and related peripherals, that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

135. In regard to any computers that are seized, to the extent practical and upon request, I will make available to EDDY and STCLAIR a "bit-stream" or "cloned" copies of the computer hard drive(s) within a reasonable amount of time after the execution of the search warrants. If, after inspecting the computer system, including all input-output devices, system software, and instruction manuals, the CIS determines that those items are no longer

necessary to retrieve and preserve the computer evidence, I will return those items as soon as practicable.

136. To the extent feasible, the CIS personnel on-site will attempt to create an electronic "image" of those parts of the computer or other electronic data storage device determined to be of relevance. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all files, hidden sectors, and deleted files. Imaging a computer, or other electronic data storage device, permits the agents to obtain an exact copy of the stored data without actually seizing the computer, or other electronic data storage device or hardware. The agent can then conduct an off-site search from the "mirror image" copy at a later date. If the CIS successfully images the computers or other electronic data storage devices, the agents will not conduct any additional seizure of the computers or other electronical data storage devices, at the search location.

137. If computer imaging proves impractical, or even impossible for technical reasons, then the agents will attempt to identify relevant data and create logical file copies (using live preview) of that data for removal, and will seize those components of the computer system or other electronic storage device that the CIS believes must be seized to permit the agents to locate the computer filed described in the warrant, at an off-site location.

## IX.  SEALING REQUEST

138. The United States requests that the Court order the applications, search warrants, and search warrant affidavit and related attachments be kept under seal until further order of the Court, with the exception that a copy of the search warrant will be left at the scenes of the search. Without such an order, individuals may conceal, damage, or destroy evidence sought by this warrant prior to its execution.

## X. CONCLUSION AS TO PROBABLE CAUSE

139. Based on the foregoing, I submit there is probable cause to believe that THOMAS EDDY,

DYANI STCLAIR, and possibly others are committing violations of 26 U.S.C. § 7201

(Tax Evasion), 26 U.S.C. § 7202 (Failure to Collect or Pay Over Tax), and 18 U.S.C. §

5324(a)(3) (Structuring); and that the items to be seized described in Attachments B-1 and

B-2 which are fruits, instrumentalities, and/or evidence of violations of federal criminal

law will be found at the subject premises described in Attachments A-1 and A-2.

_____

Jeff Nielsen
Special Agent, IRS-CI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, on this
<u>26</u> day of April, 2023.

_____
United States Magistrate Judge

## ATTACHMENT A-1

### Property to Be Searched

Commercial property and building located at 3055 S. State Street, Salt Lake City, UT 84115, with a property Parcel # 16301560030000 and description BEG 33 FT E & 62.48 FT S FR NW COR LOT 4, BLK 32, TEN AC PLAT A, BIG FIELD SUR; S 62.42 FT; E 330 FT; N 62.42 FT; W 330 FT TO BEG. 0.47 AC M OR L 4766-0199 5727-1104 9708-9748 9711-7621.

The building structure is located on the East side of State Street and is located just to the South of a business called Sabor Latino and just to the North of another business called Lucky's Auto. The building is finished with a gray cinderblock and brick finish with a blue color wood panel at the top of the building. There is a large sign on the Westside of the building facing State Street with a panther and the words "Exotic Kitty Gentlemen's Club" below the panther. The main entrance to the building is located on the side opposite of State Street, and is accessible via a narrow entrance way to access a parking lot on the East side of the building.





## ATTACHMENT A-2

### Property to Be Searched

Property located at 8178 S. 2570 E., South Weber, UT 84405, with a property Parcel # 132670028 and description of ALL OF LOT 7, CANYON RIDGE ESTATES. CONT. 0.65000 ACRES. ALSO, PART OF THE SE 1/4 OF SEC 35-T5N-R1W, SLB&M, DESC AS FOLLOWS: BEG AT THE NE COR OF LOT 13, CANYON RIDGE ESTATES, SD PT BEING LOC N 00^06'21" W ALG SEC LINE 160.12 FT FR THE SE COR OF SD SEC & RUN TH S 00^06'21" E ALG THE E LINE OF SD LOT 13 35.85 FT; TH W 105.75 FT TO THE NW COR OF SD LOT 13; TH N 71^15'40" E ALG THE N LINE OF SD LOT 13 111.60 FT TO THE POB. CONT. 0.04 ACRES TOTAL ACREAGE 0.69 ACRES.

The building structure is located in the Southeast portion of cul-de-sac.  The house is a two-story style with a basement. The front of the house is finished with brown brick, brown and tan rockwork, and a cream color hardy board. In addition to the main home, there is a large outbuilding located on the West side of the lot with two brown garage doors. The outbuilding has the same color finishes as the main home. The numbers "8178" are written in a top to bottom order on the left post near the two large, brown front doors to home. The numbers "8178" are also painted on the East side portion of the curb at the driveway entrance, and a fire hydrant is on the West side of the driveway entrance.



**ATTACHMENT B-1**

**ITEMS TO BE SEIZED [EXOTIC KITTY]**

The following items, records, and information are to be seized wherever they may be stored or found on the properties and in any form that they may be stored or found on the properties that constitute evidence and/or instrumentalities of potential criminal offenses including, but not limited to, 26 U.S.C. § 7201 (Tax Evasion), 26 U.S.C. § 7202 (Failure to Collect or Pay Over Tax), and 18 U.S.C. § 5324(a)(3) (Structuring), for the time period January 2015 to present:

1. Documents and records pertaining to Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

2. Documents and records pertaining to bank accounts in the name of the THOMAS EDDY, DYANI STCLAIR, Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

3. Documents, records, or communications purporting to be to or from, authorized by, or involving THOMAS EDDY, DYANI STCLAIR, Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

4. Documents, records or communications relating to the amount, quantity, or type of income generated by Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

5. Documents, records or communications relating to the expenses, including payroll, wages, tips, or other worker-related payments, made or owed by Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

6. Documents, records or communications relating to any income paid to or received by THOMAS EDDY or DYANI STCLAIR;

7. Communications relating to bank accounts in the name of the THOMAS EDDY, DYANI STCLAIR, Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

8. Communications relating to THOMAS EDDY, DYANI STCLAIR, Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR; and

9. Communications relating to THOMAS EDDY's or DYANI STCLAIR's personal taxes.

**ATTACHMENT B-2**

**ITEMS TO BE SEIZED [EDDY HOME]**

The following items, records, and information are to be seized wherever they may be stored or found on the properties and in any form that they may be stored or found on the properties that constitute evidence and/or instrumentalities of potential criminal offenses including, but not limited to, 26 U.S.C. § 7201 (Tax Evasion), 26 U.S.C. § 7202 (Failure to Collect or Pay Over Tax), and 18 U.S.C. § 5324(a)(3) (Structuring), for the time period January 2015 to present:

1.  Documents and records pertaining to Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

2.  Documents and records pertaining to bank accounts in the name of the THOMAS EDDY, DYANI STCLAIR, Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

3.  Documents, records, or communications purporting to be to or from, authorized by, or involving THOMAS EDDY, DYANI STCLAIR, Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

4.  Documents, records or communications relating to the amount, quantity, or type of income generated by Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

5.  Documents, records or communications relating to the expenses, including payroll, wages, tips, or other worker-related payments, made or owed by Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

6.  Documents, records or communications relating to any income paid to or received by THOMAS EDDY or DYANI STCLAIR;

7.  Communications relating to bank accounts in the name of the THOMAS EDDY, DYANI STCLAIR, Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR;

8.  Communications relating to THOMAS EDDY, DYANI STCLAIR, Nature's Rain, Sole Source Entertainment, Exotic Kitty, Budy Inc. DBA Mast Lounge, Dyani Divine, Alessia, or any other businesses related to THOMAS EDDY or DYANI STCLAIR; and

9.  Communications relating to THOMAS EDDY's or DYANI STCLAIR's personal taxes.